IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN A. BARRICK, | : | 1:14-cv-1456 |
| | : | |
| Plaintiff, | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| CAROLYN COLVIN, | : | |
| Acting Commissioner of the Social | : | |
| Security Administration, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

### June 8, 2015

In the above-captioned action, Plaintiff seeks review of a decision of the Commissioner of Social Security denying her application for disability and disability insurance benefits. For the reasons that follow, we shall vacate the decision of the Commissioner and remand for further proceedings.

## I.     BACKGROUND

### A.     Procedural

On April 13, 2012, Plaintiff protectively filed an application for a period of disability and disability insurance benefits, alleging a disability beginning on

August 28, 2011.  (Tr. 14).[1]  Her claim was denied, and, thereafter, Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 14).  An

ALJ conducted a hearing on September 5, 2013, at which Plaintiff was represented

by counsel and the testimony of Plaintiff and an impartial vocational expert ("VE")

was offered.  (Tr. 14).  The ALJ issued his decision on September 10, 2013,

determining that Plaintiff was not under a disability for the relevant period.  (Tr.

24).

On October 17, 2013, Plaintiff filed a request for review of the ALJ's

decision.  (Tr. 8).  On May 29, 2014, the Appeals Council denied the request (Tr.

1), making the ALJ's decision the final decision of the Commissioner.

Thereafter, on July 28, 2014, Plaintiff commenced the present action by

filing a Complaint (Doc. 1), seeking review of the ALJ's decision.  Defendant filed

an Answer on October 31, 2014 (Doc. 8), and, on the same day, the administrative

record was submitted (Doc. 9).  Plaintiff filed a brief on December 12, 2014 (Doc.

10), and Defendant filed opposition papers on January 13, 2015.  (Doc. 11).

Plaintiff submitted a reply on January 23, 2015.  (Doc. 12).  Accordingly, this

matter is ripe for disposition.

---

[1] Citations to "Tr. ___" are to pages of the administrative record filed by Defendant on October 31, 2014.  (Doc. 9).

### B.      Factual

Plaintiff was born on December 8, 1969, and was 41 years-old on the alleged disability onset date.  (Tr. 23).  Before claiming disability, Plaintiff worked as a housekeeper, a produce clerk, a meat department manager, and a meat department clerk.  (Tr. 23, 39).  She testified that she lives in a home with her husband, children, grandchildren, and two nieces.  (Tr. 34).  At the time of the administrative hearing, her children were 23, 19, 7, and 4 years-old, and the two grandchildren and two nieces in her home were under 10 years-old.  (Tr. 34, 291).  She stated that her husband is not employed and receives disability.  (Tr. 35).

### 1.      Physical health

As stated, Plaintiff is a 45 year-old woman, who is 5' 7" and around 170 pounds.  (Tr. 55).  Her primary physical complaint involves back pain.  (*E.g.*, Tr. 214).

The medical evidence of record is summarized below.

On May 18, 2011, Plaintiff underwent a hysterectomy.  (Tr. 250).  Medical documents reflect that she was scheduled to return to work on August 3, 2011, and that, upon her request, her doctor issued her a note restricting her lifting to 15 pounds or less until August 29, 2011.  (Tr. 264-65).

Plaintiff presented to a primary care physician, Dr. Bryan Reid, on August

18, 2011.  (Tr. 285).  She was apparently treated as a "new patient," having not visited the office in seven years.  (Tr. 285).  Plaintiff represented that she had been suffering from low back pain, stating that she had trouble sitting or standing for too long and lifting heavy objects.  (Tr. 285).  She related that a physician had previously informed her that she had narrowing of her spine.  (Tr. 285).  She reported that, because her employer was about to put her back on regular duty (*i.e.*, involving heavy-lifting), she had to quit and would lose her job on August 29, 2011.  (Tr. 285).  Plaintiff also stated that she had been under a lot of stress due to family and financial issues.  (Tr. 285).  Dr. Reid performed a physical examination, relevantly reporting a normal neuromuscular exam and that Plaintiff's joints were normal but she had some discomfort in her lower lumbar zone (paraspinal) near L5.  (Tr. 286).  Plaintiff had previously been prescribed citalopram hydrobromide for an adjustment disorder with anxiety/depression, and it appears that Dr. Reid renewed the prescription.  (Tr. 286).

On November 11, 2011, Plaintiff again presented to Dr. Reid.  (Tr. 283).  She reported back pain, stating that she had pain in her low and mid back while sitting, standing, or lying down.  (Tr. 283).  She represented that she had to change positions often, at least 4 to 6 times an hour.  (Tr. 283).  According to Plaintiff, she has had back problems since the 1990s, and her condition worsened in the 2000s;

specifically, in 2005, she bent down to retrieve a box of pickles while at work and her back seized up on her. (Tr. 283). As a result, Plaintiff stated that she had trouble with laundry, standing to wash dishes, doing other household tasks, and caring for her children. (Tr. 283). After examining Plaintiff, Dr. Reid assessed that she had an unspecified back disorder. (Tr. 284). He noted that Plaintiff presented an almost exaggerated lumbar lordosis. (Tr. 284). He observed that she was tender with some spasms in the lower lumbar region and that there was more noticeable pain on the lumbar spinal column than on the paraspinous muscles on either side. (Tr. 284). Dr. Reid noted that Plaintiff was able to twist, had pain while completing a torque-situp, and that her back gave her pain with extension but was better with flexion. (Tr. 284). The neurological exam of Plaintiff's legs was normal. (Tr. 284). Dr. Reid concluded that Plaintiff would have problems doing any job that required lifting, but could do a non-lifting job so long as she was permitted to shift positions frequently. (Tr. 284).[2]

Plaintiff saw an orthopedist, Dr. Michael Fernandez, on May 14, 2012, reporting constant low back pain. (Tr. 287). Dr. Fernandez performed a physical examination and, also, took X-rays of Plaintiff's spine, finding good lordosis and

---

[2] Plaintiff also visited Dr. Reid's office on January 11, 2012, for conjunctivitis. (Tr. 281).

no scoliosis.  (Tr. 288).  He noted well-preserved disc height at each level with the

exception of L5-S1, where he noted loss of intervertebral disc height, moderate to

severe.  (Tr. 288).  Dr. Fernandez rendered a diagnosis of lumbar spondylosis,

degenerative disc disease, L5-S1, and chronic back pain.  (Tr. 288).  He prescribed

physical therapy, noting that surgery or epidurals would not be of benefit.  (Tr.

288).

On Plaintiff's Function Report, dated May 16, 2012, she represented that a

normal day consists of helping to care for the children (feeding them and getting

them ready for school), and helping with the laundry and dishes.  (Tr. 210).  Her

husband also assists with these tasks.  (Tr. 210).  She noted that she has no trouble

with personal care, including dressing, bathing, toileting, and feeding herself.  (Tr.

210).  However, Plaintiff represented that she cannot bend over and can hardly

pick things up from the floor, and also that she cannot sit or stand for long periods

of time without shifting positions.  (Tr. 209).  Her back pain affects her ability to

sleep, as well.  (Tr. 210).  Plaintiff also reported that she has trouble concentrating

and completing tasks because of her back pain, but that she does not struggle to

follow written or spoken instructions and typically finishes what she starts.  (Tr.

214).  Plaintiff has a drivers license and does the food shopping, and prepares some

meals during the week.  (Tr. 211-12).  She can pay bills, count change, and use a

checkbook and money orders, but notes that she does not have a savings account. (Tr. 212).  She watches two television shows per day and states that she does not spend time with others outside of the home.  (Tr. 213).

Plaintiff's testimony at the administrative hearing was similar to her Function Report, although at the hearing she reported more severe pain and more limited functioning.  For instance, at the hearing Plaintiff stated that her husband helps her bathe and sometimes helps with toileting, since she cannot twist to clean herself.  (Tr. 43).  She stated that she is in constant pain, which she rated as an 8 out of 10, and can only sit for 10 minutes at a time and can stand for 10 to 15 minutes.  (Tr. 45, 46).  Plaintiff also confirmed that she was taking Amitriptyline, which is used to treat depression and which Plaintiff averred helped her sleep, and occasionally Ibuprofen 800 for pain.  (Tr. 53).

### 2.   Mental health and intellectual ability

During much of her academic career, Plaintiff received learning support services, including an Individualized Education Program ("IEP").  (Tr. 35). Plaintiff was recommended for "EMR Class (Special Education)," EMR meaning "educable mentally retarded,"[3] in 1979 when she was in third grade.  (Tr. 244).  An

---

[3] *See, e.g.*, *Liscio by Hippensteel v. Woodland Hills Sch. Dist.*, 734 F. Supp. 689, 690 (W.D. Pa. 1989) (in the context of special education, EMR means "educable mentally retarded"); Ellen Smith, Note, *Test Validation in the Schools*, 58 Tex. L. Rev. 1123, 1123 (1980) (same).

IEP dated May 20, 1985, states that Plaintiff was to attend all regular 10th grade subjects except for English and Social Studies based on satisfactory performance. (Tr. 249).  Her "primary assignment" was indicated as "EMR" and the expected duration of such services was "ongoing."  (Tr. 259).  Plaintiff earned her high school diploma and did not pursue schooling post-high school.  (Tr. 35, 36).

Plaintiff was referred to Dr. Jennifer L. Hartey, a licenced psychologist, by the Office of Social Security Disability, and her mental status and current psychological functioning were evaluated on June 28, 2012.  (Tr. 290).  Per Dr. Hartey's evaluation, Plaintiff reported that she had been experiencing increased levels of stress with some unmanageable depression recently, particularly since she stopped working in 2011.  (Tr. 290).  She denied any history of psychiatric or psychological treatment.  (Tr. 290).  Plaintiff related an incident of sexual molestation when she was a teenager, but denied that it presently negatively impacted her functioning.  (Tr. 291).  In terms of Dr. Hartey's behavioral observations, Plaintiff was adequately groomed and appropriately dressed and was alert and fully oriented.  (Tr. 291).  She was able to follow the interview without significant difficulty, and her concentration was intact, as she was able to complete a task of serial sevens without difficulty.  (Tr. 291).  Dr. Hartey found Plaintiff's working memory, insight, and judgment to be somewhat inefficient.  (Tr. 291).  Dr.

Hartey administered the Wechsler Adult Intelligence Scale, Fourth Edition

("WAIS-IV"), and Plaintiff obtained a Full Scale IQ of 77, comprised of four index

scores: a Verbal Comprehension Index of 68, a Perceptual Reasoning Index of 84,

a Working Memory Index of 74, and a Processing Speed Index of 100.  (Tr. 292).

Dr. Hartey remarked that, "[a]s can be seen by these scores, Ms. Barrick

demonstrated adequate processing speed and visual spatial abilities, while her

attention skills were inefficient, and her verbal skills were impaired."  (Tr. 292).  In

sum, Dr. Hartey reported that Plaintiff had an apparent history of serious learning

struggles throughout school and continuing problems coping with depression

symptoms.  (Tr. 292).  Dr. Hartey noted Plaintiff's increasing depression

symptoms and that her home-life inflicted some strain and stress, as she was

raising a large family and had experienced feelings of inadequacy in her role in the

family and in general.  (Tr. 292).  Dr. Hartey stated that Plaintiff's current test

results are consistent with Borderline Intellectual Functioning and that it was likely

that Plaintiff did struggle with academics while in school, given her scores and

identified difficulties.  (Tr. 292).  Plaintiff's mood symptoms were deemed

consistent with a diagnosis of Depressive Disorder NOS, and Dr. Hartey believed

she would benefit from therapy.  (Tr. 292).

On July 22, 2013, Plaintiff saw Dr. Rashid Chaudhry for a psychiatric

evaluation.  (Tr. 346).  Dr. Chaudhry diagnosed Plaintiff with Mood Disorder due

to Medical Condition, in his commentary noting that Plaintiff had degenerative

joint disease and was depressed secondary.  (Tr. 346-47).

At the administrative hearing, Plaintiff confirmed that she had been in

special education classes.  (Tr. 35).  She also described that, at her jobs, she

sometimes needed instructions to be explained to her multiple times because she

had difficulty understanding.  (Tr. 48).  She stated that she needed to be shown

how to do tasks one-on-one, on repeated occasions.  (Tr. 48-49).

### C.  Administrative decision

In rendering his decision, the ALJ utilized a five-step sequential evaluation

process requiring him to consider whether a claimant:  (1) is engaging in

substantial gainful activity;[4] (2) has an impairment that is severe or a combination

of impairments that is severe;[5] (3) has an impairment or combination of

---

[4] If the claimant is engaging in substantial gainful activity, the claimant is not disabled
and the sequential evaluation proceeds no further.  Substantial gainful activity is work that
"involves doing significant physical or mental activities" and is "done for pay or profit, whether
or not a profit is realized." 20 C.F.R. § 404.1572.

[5] The determination of whether a claimant has any severe impairments, at step two of the
sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(a)(4)(ii).  If a claimant
has no impairment or combination of impairments which significantly limits the claimant's
physical or mental abilities to perform basic work activities (*i.e.*, the abilities and aptitudes
necessary to do most jobs), the claimant is "not disabled" and the evaluation process is complete.
20 C.F.R. § 404.1520(c); *id.* § 404.1521(b).  If a claimant has any severe impairments, the
evaluation process continues.

impairments that meets or equals the requirements of a listed impairment;[6] (4) has the residual functional capacity ("RFC") to return to her past work;[7] and, (5) if not, whether she can perform other work in the national economy. *See* 20 C.F.R. § 404.1520; *Poulos v. Comm'r of Soc. Sec.,* 474 F.3d 88, 91-92 (3d Cir. 2007).

Residual functional capacity, determined at step four of the sequential evaluation, is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. *See* Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or a similar work schedule. *See id.* The RFC assessment considers the limiting effects of all of a claimant's impairments, including those that are not severe, *see* 20 C.F.R. § 404.1545(e), and must include a discussion of the individual's abilities, *see* SSR 96-8p; *see also Hartranft v. Apfel,* 181 F.3d 358, 359 n.1 (3d Cir. 1999) ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her

---

[6] Disabling impairments are listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, and meets the duration requirement, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

[7] If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

impairment(s).").

Here, as a preliminary matter, the ALJ determined that Plaintiff met the insured status requirement to receive disability insurance benefits through December 31, 2016.  *See* 42 U.S.C. § 423.  As to step one of the sequential evaluation process, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 28, 2011, the alleged onset date.  (Tr. 16).

Next, the ALJ determined that Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine; an affective disorder; and borderline intellectual functioning.  (Tr. 16).

At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.  (Tr. 17).  The ALJ noted that he considered the criteria of listing 1.00 (Musculoskeletal System), 12.04 (Affective Disorders), and 12.05 (Intellectual disability).  (Tr. 17-18).

At step four, regarding Plaintiff's RFC, the ALJ determined that Plaintiff can perform "sedentary work" as defined by 20 C.F.R. § 404.1567(a) with some qualifications.  (Tr. 19).  He specifically indicated that Plaintiff can perform work that does not require exposure to extreme cold temperatures, wet/damp work environments, excessive vibrations, or work with hazards, and that there should be

no climbing of ladders, ropes, and scaffolds and only occasional performance of all other postural activities.  (Tr. 19).  He found that Plaintiff can perform work limited to simple, routine, repetitive tasks performed in a stable environment with only occasional interaction with the public and coworkers and that allows for alternation between sitting and standing every 30 minutes.  (Tr. 19).

In light of the RFC assessment, the ALJ determined that Plaintiff was unable to perform her past relevant work as a housekeeper, produce clerk, meat department manager, or meat department clerk.  (Tr. 23).  His finding was based on the VE's testimony that those jobs are classified as light to medium work, while Plaintiff is restrained to less than a full range of sedentary work.  (Tr. 23).

Finally, at step five, the ALJ found that Plaintiff was able to perform other jobs that exist in significant numbers in the national economy.  In rendering this assessment, the ALJ considered Plaintiff's RFC and her vocational factors, stating that Plaintiff was 41 years-old on her alleged disability onset date and possesses at least a high school education and ability to communicate in English.  (Tr. 23).  Based on the VE's testimony, the ALJ found that Plaintiff could perform the requirements of such jobs as lens inserter, sorter, and addressing clerk.  Ultimately, the ALJ declared that Plaintiff has not been under a disability from August 28, 2011, through the date of the decision.  (Tr. 24).

## II.   STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  *See Poulos,* 474 F.3d at 91; *Schaudeck v. Comm'r of Soc. Sec. Admin.,*  181 F.3d 429, 431 (3d Cir. 1999); *Krysztoforski v. Chater,* 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  *Poulos*, 474 F.3d at 91*; Brown v. Bowen,* 845 F.2d 1211, 1213 (3d Cir. 1988); *Mason v. Shalala,* 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. § 405(g); *Fargnoli v. Massanari,* 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); *Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  *Keefe v. Shalala,* 71 F.3d 1060, 1062 (2d Cir. 1995); *Mastro v. Apfel,* 270 F.3d 171, 176 (4th Cir. 2001); *Martin v. Sullivan,* 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Pierce v. Underwood,* 487 U.S. 552, 565

(1988) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938));

*Johnson v. Commissioner of Social Security,* 529 F.3d 198, 200 (3d Cir. 2008);

*Hartranft v. Apfel,* 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance.  *See Brown,* 845 F.2d at 1213.  In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being supported

by substantial evidence." *Consolo v. Federal Maritime Commission,* 383 U.S. 607,

620 (1966).  Substantial evidence exists only "in relationship to all the other

evidence in the record," *Cotter,* 642 F.2d at 706, and "must take into account

whatever in the record fairly detracts from its weight."  *Universal Camera Corp. v.

N.L.R.B.,* 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial

evidence if the Commissioner ignores countervailing evidence or fails to resolve a

conflict created by the evidence.  *See Mason,* 994 F.2d at 1064.  The

Commissioner must indicate which evidence was accepted, which evidence was

rejected, and the reasons for rejecting certain evidence. *See Johnson,* 529 F.3d at

203; *Cotter,* 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the

Commissioner must scrutinize the record as a whole. *See Smith v. Califano,* 637

F.2d 968, 970 (3d Cir. 1981); *Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3d Cir.

1979).

## III.   DISCUSSION

Here, Plaintiff argues that the ALJ erroneously: failed to find that she met

medical listing 12.05(C) at step three of the analysis; relied upon flawed vocational

testimony; inadequately explained his credibility determination; and credited

certain medical evidence.

### A.   12.05(C) finding

In her first contention, Plaintiff asserts that the ALJ committed error by

finding that her intellectual disability did not meet the prerequisites of Listing

12.05(C).

The regulation defines Intellectual Disability as "significantly subaverage

general intellectual functioning with deficits in adaptive functioning initially

manifested during the developmental period; i.e., the evidence demonstrates or

supports onset of the impairment before age 22."  20 C.F.R. pt. 404, subpt. P, app.

1, § 12.05.  To meet the required level of severity for this disorder pursuant to

12.05(C), a plaintiff must "i) have a valid verbal, performance or full scale IQ of

60 through 70, ii) have a physical or other mental impairment imposing additional

and significant work-related limitation of function, and iii) show that the [intellectual disability] was initially manifested during the developmental period (before age 22)." *Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003).

The ALJ found that Plaintiff did not meet the 12.05(C) criteria. (Tr. 18). He noted that although Plaintiff achieved a verbal comprehension score of 68 on the WAIS-IV, "her work history, her full-scale IQ score of 77, and her performance on mental status examinations including no difficulty in performing serial sevens, indicate that a diagnosis of borderline intellectual functioning is appropriate rather than Intellectual Disability." (Tr. 18). The ALJ additionally cited that Plaintiff did not have a valid IQ score establishing intellectual disability from before the age of 22. (Tr. 18).

## 1.   IQ score of 60 through 70

Turning to the first prong of the 12.05(C) requirements, where verbal, performance, and full scale IQs are provided by the administered test, we are obliged to use the lowest of the IQs in conjunction with 12.05(C). *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(c); *Markle*, 324 F.3d at 186. However, the Commissioner may reject an IQ score that is inconsistent with the record. *See Markle*, 324 F.3d at 186.

In *Markle v. Barnhart*, the Third Circuit held that an ALJ's determination

that a claimant did not meet the 12.05(C) criteria was not supported by substantial evidence.  There, the claimant had achieved a verbal IQ of 73, a performance IQ of 72, and a full-scale IQ of 70, and the ALJ rejected the low score based on, *inter alia*, the claimant's ability to perform the daily functions of his life and his procurement of a GED.  *See* 324 F.3d at 184-85.  Specifically, the claimant lived alone and took care of his own apartment; independently performed all self-care needs; payed his own bills; could add and subtract; could use an ATM; administered his own medication; and had been employed painting and wallpapering homes and cutting grass.  *See id.* at 183, 186.  In addition, the psychologist performing the claimant's consultative evaluation reported positively concerning the claimant's appearance and demeanor, and stated that, despite the claimant's cognitive challenges, he could use judgment, follow work rules, interact with co-workers and supervisors, and understand, remember, and carry out complex and detailed job instructions.  *See id.* at 183-84.  Nonetheless, the Third Circuit concluded that the ALJ had improperly rejected the claimant's qualifying IQ score, specifically stating that the activities the claimant was capable of were not inconsistent with an intellectual disability as defined in the statute.  *See id.* at 187.  The Court further noted that the examining psychologist clearly considered the IQ scores to be valid, as the doctor did not qualify them or find them to conflict

with the claimant's appearance or conduct.  *See id.*

In view of *Markle*, we find that the ALJ erroneously discounted Plaintiff's verbal score of 68.  Her work history does not contradict the score, as her previous employment involved mostly low-skilled, physical tasks, and her position as a manager in a meat department did not require any written work or higher level reasoning or ability.  (Tr. 39-40 (Plaintiff's testimony that, as manager, she did not set the work schedule for her subordinates or do paperwork; rather, she was responsible for filling cases, changing prices, throwing away spoiled food, and giving verbal instructions to associates)).  Plaintiff's ability to adequately perform the tasks of daily living also is not inconsistent with her score.  *See Markle*, 324 F.3d at 187.  As to the ALJ's citation to Plaintiff's full-scale IQ score of 77, such reliance ignores the directive to utilize the lowest of the index scores.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(C); *see also Elder v. Comm'r of Soc. Sec.*, No. 07-cv-59, 2008 WL 2993501, at *5-6 (W.D. Pa. July 31, 2008) (finding error where ALJ failed to credit verbal scores of 68 and 69, even though the claimant had achieved full scale IQ scores of 73 and 79 and performance scores of 79 and 81).  Further, there is nothing in the record to indicate the invalidity of the WAIS-IV scores, and Dr. Hartey believed that they accurately reflected Plaintiff's intellectual functioning, even though Plaintiff performed adequately on other

mental status exams and could complete serial sevens. (Tr. 292). To the extent the ALJ determined that a "diagnosis of borderline intellectual functioning is appropriate rather than Intellectual Disability" (Tr. 18), we note that Plaintiff's IQ score, not her diagnosis, is in issue in a 12.05(C) analysis. *See Elder*, 2008 WL 2993501, at *5 (explaining that 12.05(C) does not require a particular diagnosis but a valid IQ score of 70 or below). Finally, Defendant's primary argument that Plaintiff's adaptive functionability belies a claim of intellectual disability is inapt. Per the plain language of the regulation, a claimant demonstrates the required level of severity for an Intellectual Disability by meeting the criteria of 12.05(C), and the regulations does not call for a separate showing of a deficiency in adaptive functioning. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05; *see Markle*, 324 F.3d at 187 (not requiring a discreet analysis as to adaptive functioning); *see also Harrison v. Astrue*, No. 07-cv-1136, 2008 WL 4133085, at *7 (W.D. Pa. Aug. 29, 2008) ("The level of the severity [required to prove an intellectual disability] is determined by considering the requirements of A, B, C, or D, not by separately proving that there are 'deficits in adaptive functioning.'").

Accordingly, the ALJ's determination that Plaintiff did not possess a valid verbal IQ of 68 was not supported by substantial evidence.

### 2. Other impairment imposing additional and significant work-related limitation of function

Although the ALJ does not appear to have directly considered whether Plaintiff possessed a qualifying "other impairment," the second prong of the 12.05(C) test is ostensibly met.  At step two of the sequential process, the ALJ found that Plaintiff suffered medically determinable severe impairments, including degenerative disc disease of the lumbar spine, an affective disorder, and borderline intellectual functioning.  (Tr. 16).  He went on to observe that these impairments and their symptoms limit Plaintiff's ability to perform basic work activities like lifting, carrying, pushing, pulling, standing, walking, interacting and relating with others, and maintaining attention and concentration.  (Tr. 16).  This is sufficient to satisfy the 12.05(C) requirement that Plaintiff have a physical or other mental impairment imposing additional and significant work-related limitation of function. *See Markle*, 324 F.3d at 188;  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50772 (August 21, 2000) (clarifying that "significant work-related limitation of function" means an impairment that is "severe" as defined in 20 C.F.R. § 404.1520(c)).

### 3. Onset of impairment before age 22

Lastly, we must consider whether Plaintiff's impairment manifested before the age of 22.  Here, the ALJ's analysis was confined to his observation that Plaintiff did not possess a valid IQ score establishing an intellectual disability

21

during the developmental period.  (Tr. 18).  The ALJ's rationale misconstrues the

requirements of 12.05(C).  The regulations do not specifically demand the proffer

of an IQ score, but rather some evidence that demonstrates or supports the onset of

the impairment prior to age 22.  *See Cortes v. Comm'r of Soc. Sec.*, 255 F. App'x

646, 652-53 (3d Cir. 2007) (explaining that "in order for a claimant to carry her

burden with respect to the onset of mental retardation, it is unnecessary to produce

intelligence testing (or other contemporary evidence) prior to age 22," and "[t]he

claimant need only produce evidence that demonstrates or supports onset of the

impairment before age 22"  (citation and internal quotation marks omitted)).

Plaintiff's education records show that she was enrolled in special education

classes and received an assessment of "educable mentally retarded," and also, Dr.

Hartey stated her belief that Plaintiff "did struggle across the board with academic

work while in school."  (Tr. 292).  This evidence is sufficient to support the

requisite onset date.  *See*, *e.g.*, *Sinkler v. Colvin*, No. 3:14-CV-00463, 2015 WL

507215, at *7 (M.D. Pa. Feb. 6, 2015) (citing *Markel*, 324 F.3d at 188-89; *Cortes*,

255 F. App'x at 653) (the claimant could meet burden to show onset date where

she enrolled in special education classes and there was no evidence of a traumatic

event that might have induced an intellectual disability later on in life).

    In sum, the Court finds that remand is appropriate for further development of

the record concerning whether Plaintiff met the 12.05(C) criteria.  Because we remand on this ground, we do not address Plaintiff's remaining arguments.

## IV.   CONCLUSION

For the reasons herein stated, the Court shall remand this matter for further proceedings consistent with this Memorandum.  An appropriate order shall issue.